[Civ. No. 8696.   Third Dist.   Jan. 31, 1956.]

GEORGE RADDUE, JR., Respondent, v. VINCENT LeSAGE et al., Appellants.

F. L. Sinclair for Appellants.

Anthony J. Kennedy for Respondent.

VAN DYKE, P. J.—This was an action brought to reform a written contract for the purchase of merchantable timber upon a described parcel of land and to enforce the contract as reformed. The trial court reformed the contract and gave judgment in accordance with such reformation and the defendants appeal.

The complaint alleged that on the 4th of April, 1951 appellants and respondent entered into a written contract whereby respondent agreed to purchase from appellants all merchantable timber as defined in the contract upon Section 1, Township 16 North, Range 7 East, M.D.B. & M. and to pay to appellants therefor the total sum of $35,000, payable $10,000 upon execution of the agreement and the balance at the rate of $16 per thousand board feet as merchantable timber was cut and felled; that the contract was entered into by the parties upon the belief that there was on the land merchantable timber in the amount of approximately 3,500,000 board feet and that this belief was shared by both parties; that both were mutually mistaken in that belief and that in fact the stand of merchantable timber was less than 1,000,000 board feet; that if there had been the amount believed to exist the price of $35,000 would have been at the rate of $10 per thousand and that such a rate would have been equitable; that the parties intended that respondent should pay to appellants for the timber actually on the property $10 per thousand board feet and that respondent was unaware of this mistaken belief as to quantity until he had engaged upon the harvesting of the merchantable timber; that when he ascertained the merchantable timber was less than the believed amount he had already paid the sum of $16,784, but that he continued to harvest until he had taken the whole stand, somewhat less than 1,000,000 board feet; that because of the mutual mistake the contract did not express the intentions of the parties and that this failure of the contract as written

to express their mutual intentions had resulted in damage to respondent in that he should have paid less than $10,000, but had paid actually $16,784. He prayed that the contract be reformed to express the parties' intention and that he have judgment for his overpayment.

The trial court found as follows: That the parties had made the contract as alleged and that it had been entered into upon their mutual and mistaken belief that there was a stand of merchantable timber on the property of approximately 3,500,000 board feet; that the actual merchantable timber was only 1,150,000 board feet; that the parties had mutually intended by their written contract to fix a price for the timber of $10 per thousand board feet for second growth timber and $12 per thousand board feet for first growth timber and that accordingly the price that was to be paid to appellants totaled $12,522.12 instead of $35,000. The court concluded that respondent was entitled to judgment reforming the written contract so as to state the amount of timber sold as 1,154,000 board feet for a total price of $12,522.12. and that the contract should be enforced as so reformed. There were other provisions in the judgment and other findings made which we will discuss hereinafter.

Appellants contend that the evidence considered in connection with the contract provisions does not support the findings and judgment of the trial court and we have concluded that this contention must be sustained.

This is not a case where the claim is that the contract as drawn was not worded exactly as the parties intended it should be worded, that is, that by mistake the contract did not state the parties' agreement as they mistakenly believed it did. This case is one wherein the plea for reformation is based upon a mutual assumption of the existence of a fact or a condition which did not in fact exist. Respondent's contention specifically was that the parties mutually and in good faith, but mistakenly, believed there was approximately 3,500,000 board feet of merchantable timber as defined in the contract upon a described section of land and that, so believing, the parties agreed that for that timber respondent should pay appellant $35,000 in this manner: $10,000 upon execution of the agreement, and $16 per thousand as the timber was harvested until $25,000 more had been paid. Merchantable timber was defined as follows: "The term 'merchantable timber,' as the same is used herein, shall include all sound Pine, Fir and Cedar trees having a stump

diameter of not less than twenty (20) inches, breast high and inside the bark. The term 'sound,' as used herein, shall include only trees that are commercially free from rot and disease, trees that are less than one-half (1/2) sound, by gross log scale shall not be deemed merchantable.'' It is obvious that belief as to the exact amount of timber that would meet these specifications upon a section of land could not be honestly entertained by either party to the contract; it is equally obvious that exact certainty could not be determined by any other means except the harvesting of the timber and that, even then, there was room for disagreement as to whether the amount selected, cut and felled by the buyer would meet the contentions of the seller as to whether or not that amount included all merchantable timber. Therefore, the basic assumption of the quantity was necessarily an approximation and the parties themselves in their pleadings so recognized. Williston on Contracts, revised edition, under the topic ''Mistake,'' in section 1543, says:

''It next becomes necessary to define the kinds of mistake which produce the various effects referred to and entitle either or both parties to the remedies spoken of. . . . It remains, therefore, to consider what mistakes render contractual transactions voidable, and in what cases, if any, a mutual mistake as distinguished from a misunderstanding renders an agreement void, and to distinguish these cases from those where mistake has no legal effect.

''In the first place there must be excluded from consideration mistakes as to matters which the contracting parties had in mind as possibilities and as to the existence of which they took the risk. With respect to any matter not made a basic assumption of the contract the parties take their chances.''

Restatement of Contracts, section 502, states:

''. . . [W]here parties on entering into a transaction that affects their contractual relations are both under a mistake regarding a fact assumed by them as the basis on which they entered into the transaction, it is voidable, . . .''

Under comment *a* the following appears:

''Where both parties assume the existence of a certain state of facts as the basis on which they enter into a transaction, the transaction can be avoided by a party who is harmed, if the assumption is erroneous.''

Under comment *f* the following appears:

''Where the parties know that there is doubt in regard to a

certain matter and contract on that assumption, the contract is not rendered voidable because one is disappointed in the hope that the facts accord with his wishes. The risk of the existence of the doubtful fact is then assumed as one of the elements of the bargain.''

The present case is brought within the foregoing rules by the presence in the contract of a provision which demonstrates that the parties considered that their assumption as to the quantity of merchantable timber upon the land might be erroneous. In view thereof they expressly provided what should be their contractual relations in the event that the assumption did prove to be erroneous. By paragraph 15 of the written agreement the parties contracted as follows: ''For the purposes of this agreement the parties hereto are relying upon a cruise of said lands as reported by Leland Smith in a letter to Seller [Vincent LeSage] dated March 13, 1951. In the event cutting operations hereunder failed to yield Thirty Five Thousand and No/100 ($35,000.00) in timber at the rate of Sixteen and No/100 Dollars ($16.00) per thousand in timber cut and removed from said lands, the total consideration of Thirty Five Thousand and No/100 Dollars ($35,000.00) herein expressed shall be reduced pro-rata.'' When this provision is considered, along with the testimony as to why it was inserted in the contract, it becomes apparent that the alleged basic assumption as to the quantity of timber on the land was recognized as possibly erroneous; in short, that no mistake concerning the same existed in the sense that the assumption, if erroneous in fact, would be such a mistake as legally would authorize a reformation of the contract. We will discuss that testimony. It will be noted that the provisions quoted start with a recital that the parties were relying upon a cruise of the land as reported by one Leland Smith in a letter dated March 13, 1951. It was the claim of respondent that this letter contained statements that there was upon the land approximately 3,500,000 board feet of merchantable timber and that the parties relied thereon. Accordingly, and before trial respondent demanded of appellants that they produce this letter. Appellants forwarded a document which they stated to be a copy of the letter requested and at the trial produced the original thereof. But respondent rejected the produced letter, claiming it was not the one referred to and demanded, although it was admittedly *a letter written to appellant Vincent LeSage by Leland Smith dated March 13, 1951, and although Leland Smith testified*

that he had only written one letter and that the letter produced was that one. He described that letter as not a cruise of the timber in any sense, but as an "ocular estimate of some timber in" a section of land. That letter in part reads as follows:

"I am giving you [appellant] herewith my impressions of the logging possibilities on Sec. 1, T16N R7E which we looked over today.

"Prior to going out to this section I had studied an aerial photo of the area and had concluded that most of the area was small second growth timber and large areas of brush. However after looking over some 200 acres of second and old growth I felt that it was a much better chance for a small mill that I had imagined.

"As far as I could determine from a hasty inspection of the main pockets of pine, as indicated on the photos, I felt that in the neighborhood of 200 acres supported a stand that would warrant logging. . . .

"There appears to be in the area inspected an average of around 8000 bdft per acre of old growth and some 10000 bdft second growth large enough for cutting or for poles and piling. This second growth is very good, and the smaller diameters should be readily marketable as poles etc.

"It will be understood that the foregoing estimate is not the result of an accurate cruise which could be made but would take at least a week, and would hardly be justified at this time.

"The area, where the logging would be done, is easily accessible, and such roads as may be necessary could be put in easily. A central location for a mill is available and all the timber on the east half of the section can be skidded to this location.

"If any further comment is desired I shall be happy to furnish same.

Yours truly

(Signed) Leland S. Smith"

Obviously there is nothing in that letter, if that be the letter referred to in the contract, which would justify anyone in assuming that there were 3,500,000 board feet of merchantable timber. To be sure, 18,000 board feet per acre on 200 acres would constitute 3,600,000 board feet, but Mr. Smith tells the reader of his letter that he made only a hasty estimate; that the 10,000 board feet of second growth is made up of timber large enough for cutting *or* for poles

and piling and that the smaller diameters could be marketed as poles. The failure of this produced letter to justify the alleged basic assumption that there were 3,500,000 feet of merchantable timber on the section was recognized by respondent and his witnesses. They testified that this was not the letter referred to in the contract, but that there had been another letter which at the meeting preceding the drafting of the agreement had been exhibited to respondent and the attorney who was the scrivener and which letter was the one referred to in the contract and that that letter stated that there were approximately 3,500,000 board feet of merchantable timber on the land. Having presented testimony that the true letter demanded had not been produced and that it was last known to be in the possession of appellant, respondent produced testimony of its contents which was to the effect above stated. The court accepted this testimony and, of course, on appeal we must abide by that acceptance. There then was a letter referred to in the contract which contained statements to the effect that there were on the land 3,500,000 board feet of merchantable timber, but the proof did not stop there. Something, of course, had to be said about the adjustment clause which we heretofore quoted, and concerning the reason for its appearance in the contract the attorney who drew the agreement testified as follows: That at a meeting in his office between appellant Mr. LeSage and one Don Lewis he was advised that respondent and appellant were about to enter into a timber sales contract and that this proposed contract was at that meeting thoroughly discussed; that there was present an aerial photograph of the property and a cruise—a letter signed by one Leland Smith relative to a cruise of the property and its purported yield, its prospective yield; that when respondent joined the meeting the statement was made that the entire proposal was founded upon the contents of that letter and that respondent took the letter away, stating that he would have to see if he could gather the money for the down payment and wanted to discuss the affair with his bank; that he returned from that discussion; that after the terms of the contract were thoroughly agreed upon the contract was typed and ready for signing on the following day; that "the contract price was to be a flat figure of thirty-five thousand dollars, arrived at and agreed upon by the parties on the basis of $10 per thousand board feet for three million and a half board feet, estimated yield"; that on the basis of the discussion

had of $10 per thousand board feet there was a provision placed in the contract relative to recoupment in the event that the minimum was not present on the property. "There were two points brought up on that, principally after Mr. Raddue [respondent] had left the office and returned he stated that in order to get the money for the down payment it would be necessary that there would be some assurance that there would be that much yield. I stated that, from my experiences, that there was certainly a wide variation between estimated yield and actual yield on the property. We discussed that feature quite thoroughly and, as a result of our discussion, Mr. LeSage [the appellant] stated that he would be willing that a provision be inserted in the contract that in the event during the cutting of the timber the yield at sixteen dollars per thousand did not produce thirty-five thousand dollars, then the purchase price would be adjusted. There was a calculation made that about two million five hundred thousand would produce thirty-five thousand dollars at sixteen dollars per thousand. . . . The adjustment was to be made upon the purchase price as originally contemplated of ten dollars per thousand, or thirty-five thousand dollars. I suggested at that time a clause and that clause was drawn and read to the parties.'' He said that he suggested the wording of the clause, and that ''it is paragraph fifteen of the contract.'' Respondent testified that he took the letter, showed it to his banker in order to borrow the money and that between himself and his banker they considered the purchase to be a good one. Appellant Mr. LeSage testified that the attorney said at the meeting ''it was necessary to put something in the contract that would be like a safety valve, I believe that was what he said, a safety valve, in the event that there was not enough merchantable timber on the land to make the thirty-five thousand dollars, that the bank had requested Mr. Raddue [respondent] to see that some kind of a figure was put in there that he wouldn't have to pay the full thirty-five thousand dollars. . . . I had an estimate that the old growth was worth twenty dollars per thousand board feet; I had heard it was more and they told me,—I think it was Mr. Wendell Robey that told me that at higher altitudes it was worth more. I had gone to the Federal department and got an estimate of as high as thirty dollars that they were paying for old timber. He corrected me and said that all I could get was twenty dollars. The fair price for new growth was twelve dollars. I took a happy medium and

arrived at sixteen dollars." He stated Mr. Bridges suggested that "in the event that there was not enough to make the thirty-five thousand dollars that there should be an adjustment price. He said the only way it could be done would be to have an absolute cruise made and every tree counted and marked and none of us had the time to do that and I agreed that it was an equitable agreement and I agreed to it." He said he "agreed on the payment of sixteen dollars in the event there were not enough trees to pay the full thirty-five thousand dollars."

Both from the language of the adjustment provisions and from the testimony of the witnesses as to why those adjustment provisions were put in the contract, none of which testimony is in material dispute, it is apparent that whatever belief the parties had with regard to the amount of merchantable timber upon the land, they themselves provided what should be their contractual rights if the assumption of quantity proved erroneous. That being so, this record will not support a reformation.

There is some difference between the parties, as is apparent from the foregoing testimony, as to the proper construction of the adjustment provisions, but on the question of the sufficiency of the evidence to sustain the plea of reformation that issue is not material. If there is anything ambiguous in the clause as to the agreed adjustment in the event of deficiency in quantity of merchantable timber the remedy is not reformation but construction in the light of admissible testimony in aid of construction. Upon this subject the court made no findings nor was it asked to make any. The parties tried the case on the theory of reformation alone. The court adjudged reformation and enforced the contract as reformed. Under these circumstances we think it not proper for this court to attempt to construe the contract since it does appear that there is reasonable ground for question as to the proper construction of the adjustment clause. We think the proper thing to do is to reverse the decree of reformation and the judgment based thereon and return the cause to the trial court for construction of the contract as written, particularly as to the meaning of the adjustment provisions.

The contract gave to respondent three years within which to remove merchantable timber and then provided: "Upon expiration of said term, title to any and all merchantable timber remaining upon said premises and all rights

and privileges conveyed to or given Buyer hereunder shall automatically revert to Seller.'' The respondent as buyer went upon the property and logged the same and alleged and testified that he had removed all merchantable timber, obtaining somewhat less than 1,000,000 board feet. He thereupon released the property back to appellants and it appears that appellants both requested and received the release. There, therefore, reverted to them all right to merchantable timber not removed by respondent. Thereafter appellants cut and removed further timber and sold the same, deriving therefrom the sum of $1,148. In the court's determination, on the basis of the contract reformed, of the financial status of the parties it decreed that this sum so derived by appellants was chargeable against them in the settlement with respondent. In this we are persuaded the court fell into error. It mattered not under the terms of the contract what appellants did with their timber after reversion.

Appellants cross-complained, asserting that respondent had breached the terms of the agreement as to cleaning up after timber removal and the court adjudged that their damages in that respect amounted to the sum of $500, which decision was supported by substantial evidence and must stand as adjudged between the parties.

Insofar as the judgment decrees reformation and adjudges relief based thereon it is reversed. It is also reversed insofar as it charges against appellants the sum of $1,148 derived by them from the sale of their timber after reversion. It is affirmed as to damages on the cross-complaint. Appellants shall recover their costs.

Peek, J., and Schottky, J., concurred.