[S. F. No. 19646. In Bank. May 7, 1957.]

JAMES PARKS BRADLEY, Petitioner, v. THE SUPERIOR COURT OF THE CITY AND COUNTY OF SAN FRANCISCO, Respondent; FRANCES (BRADLEY) LANE, Real Party in Interest.

Sullivan, Roche, Johnson & Farraher and James Farraher for Petitioner.

No appearance for Respondent.

Aaron N. Cohen, Sidney Rudy and Ted Finman for Real Party in Interest.

SCHAUER, J.—A writ of certiorari was issued for the purpose of reviewing an order of the superior court adjudging petitioner to be in contempt for refusing to make certain payments to his former wife in accordance with the provisions of their property settlement agreement and decree of divorce, and directing that petitioner be imprisoned if he fails to comply with the court's order of payment. We have concluded that although upon the record before us certain of petitioner's contentions concerning interpretation of the provisions of the property settlement agreement cannot be upheld, the order directing his imprisonment for contempt upon his continued failure to make payment should nevertheless be annulled as in violation of the constitutional prohibition against imprisonment for debt. (Cal. Const., art. I, § 15.)

In May, 1946, petitioner and his then wife, Frances, entered into a property settlement agreement in which it is declared that the parties owned both community and separate property, and that they desired to agree to a separation and to settle and determine their respective property rights and to provide for the care and custody of their two minor children. The agreement further declares that it "is intended as a Property Settlement Agreement and to *refer only to property rights.* . . ." (Italics added.) The wife then instituted divorce proceedings in the state of Nevada and in June, 1946, was awarded a default divorce decree. Such decree by its terms purports to order, among other things, that the written property settlement agreement between the parties dated May 14, 1946, is "hereby approved, ratified, confirmed and adopted by the Court, and by reference made a part of this judgment and decree . . . and each of the parties is hereby ordered to carry out . . . each and all of the provisions by him or her respectively required under the terms of said agreement . . ."

In September, 1952, the Nevada decree was established in California as a decree of respondent superior court and such California decree declares that "the parties are hereby ordered to perform each and every obligation provided for by" the Nevada decree. The California decree was affirmed on appeal and became final in June, 1954. (See *Lane* v. *Bradley* (1954), 124 Cal.App.2d 661 [268 P.2d 1092].)

Under the property settlement agreement petitioner agreed, among other things, to transfer certain real and personal property to the wife, Frances, and to place in escrow as security for performance of his obligations under the agree-

ment certificates evidencing 40,000 shares of stock of Bradley Mining Company, which stock is the property of petitioner; under certain circumstances the stock could be sold with the proceeds going to Frances. Petitioner further agreed to pay to Frances "forty per cent. (40%) of his net income, commencing January 1st, 1947, exclusive of capital gains and losses and distributions out of capital, but before deduction of income taxes or charitable contributions, less one per cent. (1%) of such net income for each 1,000 shares of said 40,000 shares of capital stock of Bradley Mining Company placed in escrow which have been sold with the consent of First Party [Frances] pursuant to . . . this contract."

Following the Nevada divorce, petitioner remarried in March, 1948, and Frances remarried in October, 1948. For four and one-half months after his remarriage petitioner computed his payments to Frances on the theory that half his income belonged to his new wife as community property and that therefore he was obligated to pay to Frances 40 per cent of only his one-half of such community income. Petitioner was then advised by the attorney *who had represented both parties in preparing the property settlement agreement* that his apportionment theory was erroneous in that his remarriage did not affect the computation of the amounts accruing under his obligations to Frances. Thereafter, from August, 1948, until he secured independent counsel in March, 1950, petitioner computed his payments to Frances without any adjustment based on his remarriage. Then such independent counsel advised petitioner that in his opinion petitioner was obligated to pay to Frances only 40 per cent of one-half of the community income of petitioner and his new wife, and, further, that the words "net income" as used in the property settlement agreement meant net income as computed for income tax purposes (that is, gross income less certain deductions not theretofore taken by petitioner in computing his payments to Frances). Relying upon such advice petitioner paid Frances only $1,800 during the year 1950. (The factual data used for computing such amount are not shown in the present record.)

Thereafter, in April, 1951, petitioner consulted different independent counsel and was advised that the remarriage of Frances terminated petitioner's obligations to pay to her 40 per cent of his net income and that he had already overpaid her under the terms of the property settlement agreement. Petitioner thereupon ceased all such payments, and in June,

1951, Frances commenced the action[1] by which the Nevada divorce decree was established as a decree of the California superior court. Petitioner defended the action on the ground that the provision for payment to Frances of 40 per cent of his net income was an alimony provision and therefore was terminated by the remarriage of Frances. The trial court made its findings and conclusions to the effect that petitioner's obligation to make payments to Frances was a continuing one which "has not terminated or been diminished by reason of the remarriage of plaintiff [Frances] or for any other reason." Judgment was entered awarding Frances recovery of the sums accrued to that date on the theory indicated in the above mentioned findings and conclusions, and establishing the Nevada decree in this state. As hereinabove mentioned, the judgment, which became final in June, 1954, also ordered the parties "to perform each and every obligation provided for by" the Nevada decree.

In February, 1955, Frances instituted the present contempt proceeding, asserting that since June 16, 1951, petitioner has wilfully failed and refused to pay to her 40 per cent of his net income, except for a payment of $15,000 on account, and that as of February, 1955, he owed her an additional $37,969.30. Petitioner defended on the ground that the term "net income" should be construed so as to permit him to make various deductions and that one-half his salary (i.e., one-half of the community income of himself and his present wife) should be excluded on the theory that it was not his income but belonged to such wife.

The evidence which was presented to the trial court consisted in part of the judgment roll in the California action. In addition testimony was submitted in the form of affidavits. The court found that in using the term "net income" the parties had not intended that petitioner be allowed any of the deductions for which he contended or that a half of the community income be excluded in case he remarried. Judgment was rendered accordingly, and petitioner was held in contempt and ordered imprisoned unless he made installment payments to Frances pursuant to a schedule set forth in the order of contempt and commitment. This petition for review followed.

 Petitioner, contending that the trial court erred in its finding as to the meaning of the term "net income," cites

[1]Hereinafter for brevity referred to as the California action.

(*Messenger* v. *Messenger* (1956), 46 Cal.2d 619, 626 [4] [297 P.2d 988]) and quotes the rule that "In the absence of conflicting extrinsic evidence as to the meaning of the agreement, the trial court's interpretation of it is not binding on this court." But where, as here, conflicting extrinsic evidence was presented, the quoted rule does not apply. On the contrary, under such circumstances if there is evidence which supports the trial court's interpretation, including inferences which it could reasonably draw, the court on appeal will adhere to the interpretation placed by the trial court on the writings and conduct of the parties. (*Quader-Kino A. G.* v. *Nebenzal* (1950), 35 Cal.2d 287, 294 [1] [217 P.2d 650], and cases cited therein; *Abbott* v. *Hauschild* (1952), 113 Cal. App.2d 383, 387 [2] [248 P.2d 41].) ██ Petitioner's suggestion, that because in the present case the evidence was presented by affidavit rather than orally it will be weighed by an appellate court, is without merit. (See *Riley* v. *Turpin* (1956), 47 Cal.2d 152, 157 [6] [301 P.2d 834].)

██ Following the rule stated, it appears that the evidence supports the trial court's interpretation of the agreement here involved, based upon its finding as to the intent of the parties. Such supporting evidence consists of affidavits of Frances and of the attorney who drafted the agreement, the language of the agreement itself, and petitioner's own conduct. Inasmuch as petitioner argues the weight of the evidence rather than seriously urging that there is no evidence whatsoever supporting the trial court's construction of the agreement, no useful purpose would be served by here relating the evidence in detail.[2] ██ Petitioner's argument that since his remarriage his present wife's community (one-half) interest in his earnings must be deducted before computation of the 40 per cent payable to Frances, likewise is without merit in view of the trial court's determination that such a deduction was contrary to the intentions of petitioner and Frances at the time they executed their contract. ██ Further, such a contract settling property rights does not constitute an assignment of

---

[2]The following portions of the oral opinion rendered by Judge Sweigert ably summarize much of the evidence which supports his (the trial court's) decision: "[T]here is no better place to look for enlightenment than to the conduct of the parties themselves . . . [T]he admissions and the attitude of the defendant husband in litigation and his acquiescence for a long period following the executions of the agreement furnish powerful rebuttal of his present claims. According to the evidence in the present case, the defendant husband from the date of the agreement, May 14th, 1946, to at least March 16th, 1948, the date of his own remarriage, a period of nearly two years, computed his net income

wages or salary within the provisions of section 300 of the Labor Code, limiting such assignment.

and performed the agreement without ever asserting any of the deduction rights which he now claims . . . Now after his remarriage, March 16th, 1948, the defendant did express the opinion that his new wife's community share of his salary should be excluded and he acted on that view for several months until advised to the contrary by . . . the attorney who had represented both parties in the drafting of the agreement. . . . So far as appears no other deduction rights of any kind were ever asserted or even mentioned until March, 1950, when the defendant consulted another counsel . . . who confirmed his view regarding the deduction of the community interest of his wife and who also raised the point, apparently for the first time, that the defendant was further entitled to take all income tax deductions. . . . Thereupon the defendant ceased payments on the theory that he already had overpaid the plaintiff.

"It should be noted, however, that the defendant husband himself concedes that his first belief that he could exclude all income tax deductions was in March, 1950. That appears in defendant's affidavit . . .

"In April, 1951, the defendant husband consulted other and additional counsel who then advised him that all of his obligations under the contract had been terminated by the plaintiff's remarriage of October 21st, 1948. What advice if any was received by him in April, 1951, regarding possible deductions under the contract does not appear. At any rate, when the action to establish and enforce the Nevada decree was commenced in June, 1951, the complaint alleged that between January 1st, 1950, and June 15th, 1951, the defendant's net income had been a given amount, thirty-three thousand some odd dollars. This allegation was admitted by the defendant in his answer, although the fact of the matter was that that amount was, in fact, a computation without regard to any of the deductions now claimed by the defendant. . . . The sole point raised by the defendant in the suit was not formula for net income but the effect of the plaintiff's remarriage upon the contract obligations of the defendant.

"It is rather difficult for a court to see how a man of considerable wealth, accustomed to keeping accounts, conscious of tax and other factors, and having available at all times the advice of accountants and counsel of his own choosing, would continue to pay out under a contract substantial amounts over and above that which he himself contemplated and intended when the contract was made. In these circumstances such alleged overpayments are not explainable by inadvertence or ignorance; the only reasonable conclusion is that the defendant husband paid out exactly what he believed and originally intended to be his obligations under the terms of the contract until he was advised long after the contract was made that it could be interpreted to mean something different than his own original intent. But in this situation we go even further than that. It appears here that after the defendant husband received express advice concerning a possible interpretation of the contract, even then in a formal lawsuit pending in which his obligations under the contract were involved, [he] makes a formal admission of fact which is counter to the interpretation of the contract which he now claims. For these reasons . . . I have come to the conclusion that even assuming this contract to be susceptible of the interpretation placed on it by the plaintiff wife and also susceptible of the interpretation placed upon it by the defendant husband, and even assuming that the contract is ambiguous in that respect, that the evidence of the conduct and performance of the defendant husband is such that any doubt concerning the meaning of the contract according to its terms must be resolved in accordance with the kind of performance which the defendant rendered

■ Petitioner further contends that to imprison him for failure to make payments to Frances under the property settlement agreement here involved would violate the provisions of the state Constitution forbidding imprisonment for debt. (Cal. Const., art. I, § 15.)[3] This contention is sound. In the California action it was specifically and finally determined, as between the parties, that the payments here involved are "an inseverable part of an integrated adjustment of all property relations of the parties and not . . . a severable provision for alimony," and that therefore section 139 of the Civil Code did not apply so as to terminate, upon the remarriage of Frances, petitioner's obligation to make such payments. (*Lane* v. *Bradley* (1954), *supra,* 124 Cal.App.2d 661, 666-667.) And as already mentioned herein, the property settlement agreement itself declares that it "is intended . . . to refer only to property rights. . . ." ■ It is, of course, also the rule that a decree is subject to modification if the payments therein provided are for alimony, maintenance or support, even though based on a property settlement agreement, but not if, as already determined in this case, they in themselves are an integral part of an adjustment of property rights. (*Codorniz* v. *Codorniz* (1950), 34 Cal.2d 811, 814 [215 P.2d 32] ; *Hough* v. *Hough* (1945), 26 Cal.2d 605, 612-615 [160 P.2d 15].) ■ Or, as declared in *Dexter* v. *Dexter* (1954), 42 Cal.2d 36, 41-42 [265 P.2d 873], "to the extent that they [monthly payments] represent a division of the

---

under it for a considerable period rather than in accordance with his presently-asserted interpretation of the contract.

"Now for these reasons I will make a ruling . . . that the Nevada decree of June 24th, 1946, as established herein September 26th, 1952, and the property agreement of May 14th, 1946, approved and made a part of the decrees, must be interpreted to express an intention of the parties that the defendant was to pay 40 per cent of his net income . . ., exclusive of capital gains and losses and distributions out of capital, but before [the various deductions presently claimed by defendant] . . .

". . . I have separately considered the question whether or not the defendant's claim that the half-community interest of his present wife in his salary should be deductible under this contract, but I have come to the conclusion that . . . it could not be deducted under any . . . theory of interpretation of the agreement. It seems to me that agreement was negotiated in contemplation of the defendant husband's income at the time of the separation of the parties. It would be unreasonable to assume that the parties had in mind but did not mention a non-existent but possible future event which would suddenly and substantially alter the factors of the defendant's income . . ."

[3]"Sec. 15. No person shall be imprisoned for debt in any civil action, on mesne or final process, unless in cases of fraud, nor in civil actions for torts, except in cases of wilful injury to person or property; and no person shall be imprisoned for a militia fine in time of peace."

community property itself, or constitute an inseparable part of the consideration for the property settlement, they are not alimony, and accordingly cannot be modified without changing the terms of the property settlement agreement of the parties.''

Neither the court nor the Legislature may impair the obligation of a valid contract (Cal. Const., art. I, §§ 1, 16) and a court cannot lawfully disregard the provisions of such contracts or deny to either party his rights thereunder. (*Majors* v. *Majors* (1945), 70 Cal.App.2d 619, 627 [10] [161 P.2d 494]; see also *McClure* v. *McClure* (1893), 100 Cal. 339, 343 [34 P. 822]; *Hensley* v. *Hensley* (1918), 179 Cal. 284, 287-288 [183 P. 445]; *Miller* v. *Superior Court* (1937), 9 Cal. 2d 733, 737 [4] [72 P.2d 868]; *Hill* v. *Hill* (1943), 23 Cal.2d 82, 90 [142 P.2d 417]; *Adams* v. *Adams* (1947), 29 Cal.2d 621, 624 [1] [177 P.2d 265]; *Patton* v. *Patton* (1948), 32 Cal.2d 520, 524 [196 P.2d 909].)

Although, ''As in the case of all constitutional provisions designed to safeguard the liberties of the person, every doubt should be resolved in favor of the liberty of the citizen in the enforcement of the constitutional provision that no person shall be imprisoned for debt'' (11 Am.Jur. 1128, § 327; see also *id.*, 670, § 59; 16 C.J.S. 1004, § 204(1)), a court may nevertheless punish by imprisonment as a contempt the willful act of a spouse (or former spouse) who, having the ability and opportunity to comply, deliberately refuses to obey a valid order to pay alimony or an allowance for the support of the other spouse (or former other spouse). It is held that the obligation to make such payments is not a ''debt'' within the meaning of the constitutional guaranty against imprisonment for debt. (*Miller* v. *Superior Court* (1937), *supra*, 9 Cal.2d 733, 737 [3]; *Ex parte Spencer* (1890), 83 Cal. 460, 465 [23 P. 395, 17 Am.St.Rep 266]; see also 11 Am.Jur., 1129-1130.)

Where, however, the payments provided in a property settlement agreement constitute an adjustment of property interests, rather than alimony, support, or maintenance, the more generally prevailing rule is stated to be that decrees based thereon are not enforceable by contempt proceedings. (154 A.L.R. 466, 468-469.) The rule in Washington is ''that the provisions of such [divorce]' decrees, as they relate to the payment of money (as distinguished from alimony or support money for children), cannot be enforced by contempt proceedings. [Citations of Washington cases.] As pointed out in *Corrigeux* v. *Corrigeux* [1950, 37 Wn.2d 403], 224

P.2d 343, back of these cases is the constitutional provision that there can be no imprisonment for debt (state constitution, Art. I, sec. 17), together with holdings by this court and courts generally that alimony and support money for children is not a debt within the purview of such constitutional provisions." (*Robinson* v. *Robinson* (1950), 37 Wn. 2d 511, 515 [225 P.2d 411, 413].) In Maryland it has been held that only modifiable alimony payments may be enforced by contempt, and that both child support and unmodifiable payments based on the parties' written agreement (even though such payments might be characterized as "alimony" in the court's order in the divorce proceedings) fall within the constitutional provision prohibiting imprisonment for debt. (*Bushman* v. *Bushman* (1929), 157 Md. 166 [145 A. 488, 491-492]; *Dickey* v. *Dickey* (1928), 154 Md. 675 [141 A. 387, 390, 58 A.L.R. 634].) Further, it appears that in Michigan "The fact that the court's award, made pursuant to or in accordance with the parties' agreement, includes both alimony and a property settlement (or a settlement in lieu of dower, or other obligation not enforceable by contempt proceedings) commingled in such a way that it does not appear, from the provisions of the decree, what amount of the award is alimony and what amount property settlement (or other obligation), has been deemed to preclude the enforcement of such award by contempt proceedings." (154 A.L.R. 475.)

No California case has been cited or discovered in which the point has been squarely presented and passed on. In *Miller* v. *Superior Court* (1937), *supra*, 9 Cal.2d 733, 737, enforcement by contempt was allowed of the provisions of a property settlement agreement providing for the payment of $75 a month. However, the court there pointed out (p. 739 of 9 Cal.2d) that "The basis of the obligation in the case of an approval [of a property settlement agreement] and order to pay, as in the case of an award of allowance not based on agreement, is the statutory obligation of *marital support* which is not a 'debt' within the meaning of the constitutional provision. We are of the view that the order to *pay a monthly allowance*, even though in accordance with the agreement of the parties, is not a 'debt' within the meaning of the constitutional prohibition." (Italics added.) That is to say, there may be situations in which the fact that a party has agreed to pay some fixed or ascertainable amount as alimony does not change or control the character of the obligation sought to be enforced by the other. Merely adding the con-

sensual element of agreement to pay support does not obliterate an existing legal duty. In the absence of a waiver by the contracting spouses (expressly or by necessary implication) of reciprocal rights to support other than as provided in the agreement, either party may properly seek to enforce in the divorce proceeding the obligations imposed by law as incidents of the marriage. But where the parties bargain with each other and agree that the terms of their contract shall thereupon and thenceforth grant, delimit and exclusively define their respective rights and obligations *inter se,* then it is to the contract alone, and to conventional civil proceedings for the enforcement of contract rights, that they must look for a remedy in the event of breach. Inclusion of such a contract in a judgment of divorce may furnish a basis for subsequent proceedings leading to issuance of a writ of execution but cannot support a commitment to imprisonment for failure to pay the judgment debt.

In *In re Lazar* (1940), 37 Cal.App.2d 327 [99 P.2d 342], the theory that the payments ordered were analogous to support money was in part relied upon to support enforcement by contempt of a property settlement agreement carried into the divorce decree. It may be also noted that that case, citing *Miller* v. *Superior Court, supra,* asserts (p. 331 of 37 Cal. App.2d) that compliance with an order ''directing the settlement of separate property rights, may be enforced by imprisonment,'' whereas, as already pointed out, the decision in the Miller case actually rested upon the theory of marital support. Further, the payments provided by the property settlement agreement involved in *In re Lazar* were, some nine months later, stated by this (Supreme) court to be for alimony, support and maintenance of the wife, rather than as an adjustment of property rights. (*Lazar* v. *Superior Court* (1940), 16 Cal.2d 617, 621-622 [5] [107 P.2d 249].) The case of *Tripp* v. *Superior Court* (1923), 61 Cal.App. 64, 67 [214 P. 252], also relied upon in *In re Lazar,* likewise appears to turn in part upon the husband's obligation to make ''proper provision for the support and maintenance of the wife, provided that it were first ascertained that petitioner was guilty of the charges made against him in the divorce action.'' Moreover, no mention of the constitutional provision is made in the Tripp case, and the holding that the property settlement agreement and divorce decree there involved were enforceable by contempt proceedings was reached without citation of authority in support thereof.

It is to be recognized that the term "alimony" does not contemplate a settlement of property interests or general endowment of wealth. "Like the alimentum of the civil law, from which the word was evidently derived, it has for its sole object the provision of food, clothing, habitation, and other necessaries for . . . support." (17 Am.Jur. 406, and cases cited, note 12.) It is to attain that "sole object" that the law imposes an obligation which is regarded as something other than a debt and which may be enforced by contempt proceedings upon appropriate showing. Here the judgment manifestly purports to sanction a negotiated agreement rather than an obligation imposed by law.

We are satisfied that the better view is that payments provided in a property settlement agreement which are found to constitute an adjustment of property interests, rather than a severable provision for alimony, should be held to fall within the constitutional proscription against imprisonment for debt. That is, if the obligation sought to be enforced is contractual and negotiated, as distinguished from marital and imposed by law, even though the contract relates to marriage obligations, the remedy must be appropriate to the right asserted. Payments which fall into the category of law-imposed alimony or separate maintenance are based upon the statutory obligation of marital support, may be modified by the court upon a proper showing, ordinarily terminate with the death of either party, and may properly be held not to constitute a "debt" within the meaning of the constitutional provision. No such case for special exemption from the constitutional proscription can be made where the payments represent the result of a bargain negotiated by the parties in adjustment of their respective interests, and any implications to the contrary which may be found in the following cases are disapproved: *In re Rasmussen* (1922), 56 Cal.App. 368 [205 P. 72]; *Ex Parte Weiler* (1930), 106 Cal. App. 485 [289 P. 645]; *In re Lazar* (1940), *supra*, 37 Cal. App.2d 327; *Seymour* v. *Seymour* (1937), 18 Cal.App.2d 481 [64 P.2d 168]; *Tripp* v. *Superior Court* (1923), *supra*, 61 Cal.App. 64; *Shogren* v. *Superior Court* (1949), 93 Cal. App.2d 356, 364 [209 P.2d 108].

Inasmuch as it has been finally determined, as between these parties, that the payments to be made by petitioner to Frances in the present case constitute "an inseverable part of an integrated adjustment of all property relations of the parties and not . . . a severable provision for

alimony'' (*Lane* v. *Bradley* (1954), *supra,* 124 Cal.App.2d 661, 666-667), we conclude that enforcement of such payments by contempt proceedings is forbidden by the constitutional prohibition against imprisonment for debt. This conclusion makes unnecessary a discussion of other attacks made by petitioner upon the contempt order.

For the reasons above stated, the order holding petitioner in contempt is annulled.

Gibson, C. J., Shenk, J., Spence, J., and McComb, J., concurred.

CARTER, J.—I concur in the judgment annulling the contempt order and I agree generally with the views expressed in the majority opinion, but since certain decisions of this court (*Dexter* v. *Dexter,* 42 Cal.2d 36 [265 P.2d 873] ; *Messenger* v. *Messenger,* 46 Cal.2d 619 [297 P.2d 988]) with which I do not agree are cited and relied upon in the majority opinion, I feel constrained to withhold my unqualified concurrence therefrom.

In the recent case of *Herda* v. *Herda* decided by this court on March 22, 1957, I took occasion in a concurring and dissenting opinion to call attention to the great confusion which now exists in this field of law due to irreconcilable conflicts in the decisions of this court and the appellate courts of this state. Since the main issue in the case at bar involves the interpretation and application of article I, section 15, of the Constitution of California there is no need for further discussion relating to this conflict.

TRAYNOR, J.—I dissent.

The majority opinion concedes that an alimony award based on the agreement of the parties is enforcible by contempt (see also *Holloway* v. *Holloway,* 130 Ohio St. 214 [198 N.E. 579, 154 A.L.R. 439] ; 154 A.L.R. 449) since it is sufficiently related to the statutory duty of support incident to the marriage relationship as to be outside the constitutional prohibition of imprisonment for debt. (Cal. Const., art I, § 15.) Rights and duties with respect to property growing out of the marriage relationship and crystallized in a court order are likewise outside the scope of that provision. Such an order has not less a special character because it is based on an agreement of the parties than an alimony award based on such an agreement. Indeed, in some states the very theory

underlying use of contempt to enforce awards of alimony is that alimony is itself an adjustment of property rights. (*Lyon* v. *Lyon*, 21 Conn. 185, 196-197; *State* v. *Cook*, 66 Ohio. St. 566 [64 N.E. 567, 568, 58 L.R.A. 625]; *West* v. *West*, 126 Va. 696 [101 S.E. 876, 877].)

*Tripp* v. *Superior Court*, 61 Cal.App. 64 [214 P. 252], *Petry* v. *Superior Court*, 46 Cal.App.2d 756 [116 P.2d 954], and *Seymour* v. *Seymour*, 18 Cal.App.2d 481 [64 P.2d 168], upheld the use of contempt to enforce orders pursuant to property settlements even though they were not in lieu of the statutory duty of support. (See also *Sullivan* v. *Superior Court*, 72 Cal.App. 531, 535 [237 P. 782]; *Ex parte Weiler*, 106 Cal.App. 485, 488 [289 P. 645]; *Shogren* v. *Superior Court*, 93 Cal.App.2d 356, 364 [209 P.2d 108]; *Young* v. *Superior Court*, 105 Cal.App.2d 65, 67 [233 P.2d 39].) Although the court stressed the duty of support as a basis for contempt in *Miller* v. *Superior Court*, 9 Cal.2d 733 [72 P.2d 868], it cited with approval the Seymour and Tripp cases and expressly refused to follow the Maryland cases (*Dickey* v. *Dickey*, 154 Md. 675 [141 A. 387]; *Bushman* v. *Bushman*, 157 Md. 166 [145 A. 488]), now invoked by the majority opinion.

Even if the statutory duty of support were the sole justification for enforcing such court orders by contempt, the majority opinion would still be in error in stating that an order to make payments pursuant to an integrated bargain cannot be so enforced, when the wife has not remarried. In *Dexter* v. *Dexter*, 42 Cal.2d 36, 41-42 [265 P.2d 873], we stated: "When, as in this case . . . , the parties have made the provision for support and maintenance an integral part of their property settlement agreement, the monthly payments will ordinarily have a dual character. To the extent that they are designed to discharge the obligation of support and maintenance they will ordinarily reflect the characteristics of that obligation and thus have the indicia of alimony. [Citations.] On the other hand, to the extent that they represent a division of the community property itself, or constitute an inseparable part of the consideration for the property settlement, they are not alimony, and accordingly cannot be modified without changing the terms of the property settlement agreement of the parties." So long as the wife has not remarried, the characteristics of the support and maintenance obligation remain and alone justify enforcement by contempt. Such a rule is implicit in the Miller case, where the court took care

to point out that the payments were pursuant to a property settlement and could not be changed without the consent of the parties. (9 Cal.2d at 740 [see also, concurring and dissenting opinion of Carter, J. in *Dexter* v. *Dexter*, 42 Cal.2d 36, 45 [265 P.2d 873] : ''The rule in such a case should be that if the entire agreement is approved by the court and part of its provisions are incorporated in the decree and order to be performed, those portions included in the decree may be enforced by contempt proceedings.''].)

Even if the obligation to make the payments pursuant to the order of the court did constitute a debt within the meaning of the constitutional provision, the obligor's wilful refusal to make them when he is able to do so would be a ''case of fraud'' within the meaning of the exception in that provision. In sustaining the validity of a criminal statute dealing with nonpayment of wages this court stated: ''The historical background of section 15 of article I and similar constitutional guaranties of other states clearly shows that the provisions were adopted to protect the poor but honest debtor who is unable to pay his debts, and were not intended to shield a dishonest man who takes an unconscionable advantage of another. [Citations.] It has long been recognized that wages are not ordinary debts, that they may be preferred over other claims, and that, because of the economic position of the average worker and, in particular, his dependence on wages for the necessities of life for himself and his family, it is essential to the public welfare that he receive his pay when it is due. [Citations.] An employer who knows that wages are due, has the ability to pay them, and still refuses to pay them, acts against good morals and fair dealing, and necessarily intentionally does an act which prejudices the rights of his employee. Such conduct amounts to a 'case of fraud' within the meaning of the exception to the constitutional prohibition and may be punished by statute.'' (*In re Trombley*, 31 Cal.2d 801, 809-810 [193 P.2d 734]; see also *Ex parte Grace*, 12 Iowa 208, 213 [79 Am.Dec. 529]; *Ex parte Clark*, 20 N.J.L. 648, 650-651 [45 Am.Dec. 394].)

Whether or not the reasoning of the Trombley case would apply to any wilful refusal to pay a debt when the obligor is able to pay, it clearly applies to obligations arising out of property settlement agreements irrespective of whether the payments are solely alimony. ''Property settlement agreements occupy a favored position in the law of this state and are sanctioned by the Civil Code.'' (*Adams* v. *Adams*, 29

Cal.2d 621, 624 [177 P.2d 265], and cases cited.) There may be practical considerations for an order that community property, such as a going business, remain intact and that the wife receive her share in periodic payments. Whether such payments are also intended to discharge a duty of support, they may actually be the wife's only means of support. As in the case of wages, the payments may be difficult to collect by repeated executions. The enforcement of the obligation by contempt is no more tantamount to imprisonment for debt than criminal punishment for the wilful refusal to pay wages.

I would adhere to the settled law of this state and affirm the order holding petitioner in contempt.

The petition of the real party in interest for a rehearing was denied June 5, 1957. Traynor, J., was of the opinion that the petition should be granted.