[Civ. No. 43723. Second Dist., Div. Five. June 6, 1975.]

RAY ELLISON, Plaintiff, Cross-defendant and Appellant, v.
CITY OF SAN BUENAVENTURA,
Defendant, Cross-complainant and Respondent;
VENTURA PORT DISTRICT,
Defendant, Cross-defendant and Respondent.

954

## COUNSEL

Frazier, Dame, Doherty, Parrish & Hanawalt and Richard W. Hanawalt, Edward L. Lascher and Wendy Cole Wilner for Plaintiff, Cross-defendant and Appellant.

Thompson, Lyders & Laing and K. D. Lyders for Defendant, Cross-complainant and Respondent.

Loebl, Bringgold & Peck and James D. Loebl for Defendant, Cross-defendant and Respondent.

## OPINION

**LORING, J.*** —Ray Ellison (Ellison) filed an amended complaint against City of San Buenaventura (City) and Ventura Port District (District) for injunctive relief, specific performance and damages. City and District answered. City cross-complained against Ellison and District for declaratory relief with reference to rights and obligations of the various parties under a certain written agreement entitled "Agreement of Settlement and for Conveyance of Real Properties" (Agreement) dated April 15, 1959, between Grace Hobson Smith and others[1] (landowners) and District. The cross-complaint alleged that City was the "governing entity" in charge of Porto Bello Maintenance District (Porto Bello), a special assessment district formed within City under the Improvement Act of 1911; and that Porto Bello and Ellison were successors in interest to landowners. The complaint alleged the existence of a controversy regarding rights and duties under the Agreement with reference to the maintenance of a certain waterway or channel which is within or adjacent to the Ventura Marina. After nonjury trial the court filed notice of intended decision in favor of District and against Ellison. The decision excused Porto Bello from paying money to District under the Agreement. Findings and judgment were entered accordingly. Ellison's motion to set aside the judgment was denied. Ellison (but not City) appeals from the judgment.

### CONTENTIONS

Appellant contends:

I The finding that maintenance of the channel was impaired lacks evidentiary support.

II The judgment is defective because:

    A.  The judgment does not furnish any effective relief;

    B.  There is no legal basis for conditioning District's duty because:

        1.  There is no showing of impossibility;

---

*Assigned by the Chairman of the Judicial Council.

[1]The parties to the agreement were: Grace Hobson Smith, Fred W. Smith, Walter W. Hoffman, Sheila Bergin Hoffman, Katherine Hoffman Haley and Robert G. Haley.

The original owners do not figure in this controversy since they subdivided their land into 735 parcels, most of which were sold for residential purposes.

2. The District is estopped from denying its obligation;

3. The judgment violates plaintiff's rights.

III The court abused its discretion in denying specific performance.

## FACTS

District planned to construct the Ventura Marina, an artificial yacht harbor with access to the ocean. Landowners owned adjacent land. District threatened to condemn a part of the landowners' land and in settlement of that condemnation action the parties entered into the Agreement. Under the Agreement landowners agreed to convey a portion of their land to District and District agreed inter alia to construct an access channel, called the "stub channel," which would connect proposed channels or waterways (which landowners contemplated would be constructed on landowners' remaining property) to the main Ventura Marina. Eventually landowners conveyed their remaining land to Pacesetter Homes which built a residential subdivision ("Ventura Keys") with lots and homes facing on channels or waterways, which would enable homeowners to moor their yachts in front of their homes. In the Agreement, District agreed to give landowners an access easement over the stub channel so that homeowners building on landowners' reserved property would have access to the Ventura Marina and the open sea. A portion of one of the key paragraphs is set forth in the margin.[2] District

---

[2]Paragraph "IV. AGREEMENTS, COVENANTS AND CONDITIONS" subparagraph C reads:

"C. RIGHT TO CONSTRUCT CHANNEL AND AGREEMENT TO CONVEY NAVIGATION AND DRAINAGE EASEMENT. As a further and material consideration for the conveyance to it of the Property Taken, the Port District agrees to construct at its expense a channel to a width of one hundred fifty feet (150') and a depth of fifteen feet (15') below mean low tide (or deeper at the option of the Port District) including relocation of the City of Ventura water well pipe line in, over and through that certain real property in the County of Ventura, State of California, as outlined in red on a map which is attached hereto, marked Exhibit 3, and by reference made a part hereof. The Port District agrees further that it will, in the manner hereinafter provided in Paragraph G of this Section IV, convey to the Landowners, their successors and assigns, the right exercisable at any time as hereinafter provided to extend the said channel over and through the Property Taken as outlined in black on Exhibit 3 and to connect the said channel at the option of the Landowners with any waterways which may be constructed on the Private Marina. Provided, however, the Landowners agree that they, or their successors and assigns, will so construct any such extensions of the channel and waterways as to cause the minimum degree of interference with the general design of the Harbor for the control of the ebb and flow tides, storm drainage, and other marine actions anticipated within the Harbor practical and reasonable under the circumstances. In determining what is practical and reasonable within the meaning of the foregoing privision there shall be considered both the relative benefit to the Harbor and the

agreed to maintain the channel.[3] The District specifically agreed that if it violated its obligation to build or maintain the access channel, then an

relative cost to the Landowners, or their successors or assigns, of any plan of construction.

"The Port District agrees, further, to convey to the Landowners, their successors and assigns, in the manner hereinafter provided in Paragraph G of this Section IV, an easement for navigation and drainage purposes through and across the channel described above and through the Harbor to the open ocean, together with the right to grant a like easement for navigation purposes to others. The Landowners shall have no right to convey to any other person any of their interest in the said easement for drainage purposes except insofar as the conveyance of all or a part of the Property Remaining.

"Nothing contained herein shall be construed to restrict the right of the Port District to widen or deepen the above described channel at its expense; provided, it does not in any way interfere with or restrict the navigation or drainage easements to be granted; and provided, further, that any work of improvement to deepen or widen the said channel shall be diligently prosecuted by the Port District in such fashion as to cause the least practical interference with said navigation and drainage easements."

[3]The paragraph respecting maintenance of the channel reads:

"D. MAINTENANCE OF CHANNEL. The Port District agrees to maintain the channel described in Paragraph C above in a navigable condition so long as the Harbor is in existence to a depth and width to which the channel has been constructed, including, but not by way of limitation, the prompt removal of silt and debris therefrom. The Landowners agree, however, to pay the sum of Two Thousand Dollars ($2,000.00) per annum to the Port District so long as it maintains said channel to reimburse it in part for its expenses of maintenance of said channel. The said sum shall be paid on July 1st of each year, beginning with the first year after the Landowners, or their successors in interest, exercise their right to construct an extension of the said channel as provided in Paragraph C of of [sic] this Section IV, and no such amount of maintenance charge shall be payable until such time. The first annual maintenance charge shall be prorated on the basis of the fraction of the whole year for which the Landowners, or their successors in interest, have caused the said channel to be extended.

"The annual sums provided to be paid herein shall be a charge against the Property Remaining; provided, however, that:

"(1) In the event the Property Remaining is subdivided in whole or in part, or otherwise conveyed in more than one parcel, the Landowners shall be relieved of their said obligation, and the said charge shall be by the Landowners, or their successors or assigns, caused to be prorated annually among or between the separate parcels or lots created by the subdivision or conveyance upon the basis of the relative assessed values of said lots or parcels as said assessed value is established by the Assessor of Ventura County for real property tax purposes; or

"(2) In the event a maintenance district or other similar district is established, encompassing substantially all of the Property Remaining, and that said district shall possess the power to tax or otherwise levy upon the said Property Remaining in a fashion adequate to allow the collection of amounts sufficient to satisfy the said annual obligation to contribute toward maintenance of the channel, the Landowners and the Property Remaining shall be relieved of the said obligation and charge, and the Port District shall thereafter look to said maintenance district or similar district for payment.

"The Port District agrees further to maintain that portion of the Harbor connecting the said channel to the open ocean in such fashion as to render said portion of the Harbor navigable to an extent substantially as described in the Reports of Arthur D. Little, Inc. and the Report of John A. Blume and Associates, Engineers, as amplified by Location Plan dated 12 Feb. '59 and bearing the symbol 'SK-61'.

"In the event that the Port District shall fail to maintain the said channel or the said Harbor in the manner provided in this Paragraph D of Section IV, the Landowners shall

element of landowners' damages should include but not be limited to diminution in value of the remaining land.[4]

The court heard evidence that in 1969 an unseasonably severe flood in the Arundell Barranca (a natural drainageway) deposited silt in the stub channel. The Army Corps of Engineers dredged the harbor in 1970. In the process of dredging the harbor the Army Corps of Engineers apparently lifted some pipe lines underlying stub channel. As a consequence the height of the top of one of the pipes was measured at 12 feet 3 inches below zero tide; 6 feet of mud covered the pipe which meant that the water in stub channel was barely 6 feet deep, rather than the 15 feet contemplated by the agreement. In 1970 stub channel became so clogged with silt and debris that it was impossible for landowners in the Ventura Keys to take their boats in and out of the harbor. Porto Bello arranged for a dragline to clear a 25-foot channel to a depth of 10 feet. The trial court in its notice of intended decision said in part:

"9. Port District must keep clear and navigable and maintain the portion of the harbor and channel lying in any part of the harbor

---

have the right to perform or cause to be performed such work as may be reasonably required for said maintenance and to be reimbursed by the Port District for the cost thereof (less any costs required by this paragraph to be borne by the Landowners in the maintenance of said channel)."

[4]The paragraph reads:

"J. COMPUTATION OF DAMAGES: It is agreed by the parties hereto that the construction of a small boat harbor and access from the Private Marina to the said Harbor through the channel described in Section IV, Paragraph C hereof, together with the nevigation [sic] easement, described in Section IV, Paragraph C above, will add to the value of the Property Remaining and are material considerations to the Landowners in the settlement herein provided. It is further recognized and agreed that the Landowners would not have conveyed the property described in Section IV, Paragraph A above, for the consideration stated in Section IV, Paragraph B above, if the said right to construct the channel and the said navigation easement were not granted to them. It is therefore agreed by the Port District that it will cause the Harbor to be completed by November 1, 1962 and that in the event that it shall fail to cause the Harbor to be completed by that date, or in the event that it shall have failed to construct the channel to which reference is made in Paragraph C of Section IV, or shall have without cause prevented the Landowners, or their successors in interest, from constructing the extension of the channel to which reference is made in said paragraph, or shall have ceased to operate and adequately maintain the Harbor, or shall have denied access to said Harbor to the Landowners without good cause, or shall have without due cause denied or interfered with the right of navigation of the Landowners, their successors and assigns, through and over said Harbor to the open ocean, or shall have failed to maintain the channel in the manner described in this Agreement, there shall be included as an element in the measure of damages flowing to the Landowners by reason of the breach of the Port District of any of its said covenants hereunder, any diminution in value of the Property Remaining. Provided, however, that nothing contained herein shall be deemed to be a restriction upon the rights of the Landowners to recover any other element of damage flowing to them."

generally and being on the portion of land (or now water) referred to as the 'property taken', including specifically, areas shown as Nos. 1 and 3 on Port District's Exhibit No. 2 in evidence, and the easement as described in Port District's Exhibit No. 1 in evidence and being further that certain easement described in Book 2115, page 230 of Official Records of the County of Ventura. This easement is an easement appurtenant to the property remaining and the present owners thereof.

"10. Port District has not fulfilled all of its maintenance obligations under the contract. The evidence disclosed many problems developed such as (a) an oil spill by Union and others in Santa Barbara Channel requiring a temporary coffer dam and (b) unprecedented floods of '69 which undoubtedly deposited unexpected amounts of silt and debris and (c) a dredging barge was and is not always readily available. However, the testimony of Ellison, the pictures and dredging charts show an unreasonable failure to promptly clean and keep the portion of the channel on Port District's own side of the line reasonably clear and navigable. Ellison as a successor in interest is entitled (by specific relief) to compel Port District to effectively and efficiently live up to the agreement. Ellison is a proper person to bring this action on his own behalf and on behalf of others for such relief."

In its formal findings the court found in part: "Maintenance of the channel which is the obligation of Port District and of the harbor generally has been severely hampered by natural and man-caused phenomena not the fault of Port District. Maintenance has also been limited by the unavailability and expense of suitable dredging equipment and has been restricted in scope by certain essential water and sewer facilities located under the channel. Nevertheless, Port District has not in the past reasonably and promptly maintained the channel which is its obligation to maintain as required by the agreement subject to the foregoing limitations and restrictions. The evidence at the trial indicated that Port District last fulfilled its maintenance obligations in January and February 1971."

In its conclusions of law the court concluded: "2. Port District is obligated to maintain such channel in a navigable condition so long as the harbor is in existence. Such obligation includes reasonably prompt removal of silt and debris therefrom so that the width and depth thereof will be approximately as originally constructed *subject to limitations and restrictions resulting from the placement of water and sewer facilities located under the channel, the unavailability and expense of suitable*

*dredging equipment, and the occurrence of natural and man-caused phenomena over which Port District has no control."* (Italics ours.)

The identical provision was included in the judgment.

Appellant contends that the phrase "subject to limitations and restrictions resulting from the placement of water and sewer facilities located under the channel, the unavailability and expense of suitable dredging equipment, and the occurrence of natural and man-caused phenomena over which Port District has no control" is contrary to the Agreement of the parties and is error.

## DISCUSSION

We note preliminarily that although the Agreement requires landowners (and subsequently Porto Bello) to contribute $2,000 to the cost of maintaining the channel we need not concern ourselves with that provision here since the court found that the failure to pay was excused. District and City do not appeal from the judgment and Ellison does not complain. That issue therefore is not before the court on this appeal.

Although Ellison originally contended that District was obligated to maintain all of the channels in the private marina within landowners' subdivision (Ventura Keys) the court found that District's obligation under the Agreement related only to the stub channel—the so-called entrance channel which connected landowners' private marina to the main Ventura Marina and open sea. That finding is supported by substantial evidence and as we read the briefs on appeal, Ellison does not now complain on that point.

However, we conclude that the phrase "subject to limitations and restrictions resulting from the placement of water and sewer facilities located under the channel, the unavailability and expense of suitable dredging equipment, and the occurrence of natural and man-caused phenomena over which Port District has no control" was not a part of the Agreement of the parties, that there is no substantial evidence to support engrafting such clause on to the agreement of the parties and such relief if justified under any circumstances was beyond the scope of the pleadings in this case. The instant action was an action for declaratory relief—a declaration of rights and obligations under an *existing* contract. It was not an action in equity to reform the Agreement on the ground of fraud, mutual mistake or other equitable ground. In our

view the trial court engrafted upon the Agreement of the parties limitations and conditions which they had not agreed to and which could be done, if at all, by a court of equity in an action to reform the Agreement on recognized equitable grounds. (See 1 Witkin, Summary of Cal. Law (8th ed.) Contracts, §§ 304-319, pp. 255-269.)

By the Agreement District agreed "to maintain the channel . . . in a navigable condition as long as the Harbor is in existence to a depth and width to which the channel has been constructed [i.e. 15' deep by 150' wide], including, . . . the prompt removal of silt and debris therefrom." That obligation was not made subject to the placement of water and sewer facilities under the channel. It is true that under the Agreement, landowners agreed to reimburse District for the cost of relocating "the City of Ventura water well pipe line" which apparently ran across stub channel, the landowners did apparently make such payment and District did relocate the pipe line at a depth of approximately 3 feet below the 15-foot channel. But that provision did not modify District's obligation to maintain the channel "to a width of one hundred fifty feet (150') and a depth of fifteen feet (15') below mean low tide." Under the language adopted by the trial court District would be relieved of an obligation to maintain stub channel to a depth below six feet after the United States Corps of Engineers raised the water pipe line as the result of its 1970 operations. District's contractual obligation was not so limited by the Agreement of the parties. It is true that under paragraph E of the Agreement, District did undertake to protect the "tank farm pipe lines" but that again was an additional obligation on District and did not restrict or reduce its obligation to maintain the channel to the prescribed depth and width.

Likewise the parties did not agree that District's obligation to maintain the channel would be limited or restricted in any way by the availability or expense of dredging equipment. That was clearly an addition engrafted by the court contrary to the express agreement of the parties. Of course, the *promptness* of dredging (a point on which the contract was silent) would be within a reasonable time which might depend upon the time within which suitable equipment could be reasonably obtained. The language which the court engrafted on to the Agreement of the parties relieves District of its obligation to maintain the channel if the channel is obstructed by "the occurrence of natural or man-caused phenomena." It is difficult to envision an obstruction of the channel which would not result from either natural or man-caused phenomena. That clause practically nullifies District's entire obligation.

█ It is elemental that a person may not escape a voluntarily assumed contractual obligation merely because performance would be more expensive than contemplated (*Butler* v. *Nepple,* 54 Cal.2d 589, 599 [6 Cal.Rptr. 767, 354 P.2d 239]) unless it arises to the point of impossibility. (*Kennedy* v. *Reece,* 225 Cal.App.2d 717, 724-725 [37 Cal.Rptr. 708]; see also *Hensler* v. *City of Los Angeles,* 124 Cal.App.2d 71, 83 [268 P.2d 12].) █ The evidence here did not establish the existence of any condition or expense which could not reasonably have been anticipated. District's past nonperformance therefore cannot be excused (*Caron* v. *Andrew,* 133 Cal.App.2d 402, 407-408 [284 P.2d 544]) and District's future nonperformance cannot be excused in advance by the device of rewriting the contract without the mutual consent of the parties. The court had no power to rewrite the contract. (*Bailard* v. *Marden,* 36 Cal.2d 703, 704 [227 P.2d 10]; *Raddue* v. *LeSage,* 138 Cal.App.2d 852, 854 [292 P.2d 522]; *Lemoge Electric* v. *County of San Mateo,* 46 Cal.2d 659, 662 [297 P.2d 638]; *Paterson* v. *Board of Trustees,* 157 Cal.App.2d 811, 815 [321 P.2d 825].) Ellison's predecessor in interest paid a valuable consideration for the rights which Ellison, as successor here seeks to enforce. The trial court's rewriting of the contract deprived Ellison of valuable rights merely to release District of what the court apparently regarded as substantial economic hardship and expense. That is not an adequate legal basis. (*Brown* v. *Ferdon,* 5 Cal.2d 226, 230 [54 P.2d 712]; *Bradley* v. *Superior Court,* 48 Cal.2d 509, 519 [310 P.2d 634]; *Hill* v. *City of Oxnard,* 46 Cal.App. 624, 631 [189 P. 825].)

Under the court's judgment here, District would presumably be relieved of the obligation to remove silt and debris from stub channel as a result of the 1969 flood from the Arundell Barranca and all such future occurrences, yet that is the very type of obligation that the contract initially contemplated should be discharged by District.

We conclude that the judgment on the cross-complaint of City should be modified by deleting from paragraph 2 thereof the following: "subject to limitations and restrictions resulting from the placement of water and sewer facilities located under the channel, the unavailability and expense of suitable dredging equipment, and the occurrence of natural and man-caused phenomena over which Port District has no control."

█ Unfortunately we cannot merely modify and affirm the judgment because the court's findings and judgment do not totally dispose of the issues raised by Ellison's complaint. No useful purpose would be served by retrying the issues raised by the cross-complaint for declaratory relief

since that judgment modified as directed herein may appropriately serve as the basis of the parties' rights and obligations insofar as it disposes of the issues raised by the cross-complaint.

We necessarily therefore consider Ellison's contention that the court made no disposition of the issues raised by the complaint which sought damages, specific performance and an injunction. The judgment is silent on such issues. The only apparent explanation is that the court and counsel became so engrossed in the question of the extent of District's obligation that they overlooked the enforcement of that obligation once it was defined. The judgment does not disclose that Ellison is not entitled to the relief which he sought if that be the fact.

It is elemental that a court's findings and judgment must dispose of all of the issues and grant or deny the relief sought. 4 Witkin, California Procedure, (2d ed.) Trial, section 337, page 3139:

"The right of a party to findings is a right to express findings on all material issues raised by the pleadings or otherwise (see C.C.P. 632, Superior Court Rule 232(e), supra, § 322), and failure to find on a material issue will ordinarily amount to reversible error. . . .

"The failure to find on a material issue is too fundamental a defect to be waived by failure to object or to propose amendments to the findings in the trial court. . . . And the appellate fact-finding power under C.C.P. 909 is seldom a means of saving the judgment, for it will not be exercised where the record shows a substantial conflict in the evidence. . . ."

The judgment is reversed and the cause is remanded to the trial court with directions to proceed in accordance with the views expressed herein.

Stephens, Acting P. J., and Ashby, J., concurred.

A petition for a rehearing was denied July 2, 1975.