Filed 7/21/25  VMA Palomar v. Farmers & Merchants Trust Co. etc. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| VMA PALOMAR, LLC,<br><br>　　　Plaintiff and Respondent,<br><br>　　　　　v.<br><br>FARMERS & MERCHANTS TRUST COMPANY OF LONG BEACH,<br><br>　　　Defendant and Appellant. | B340167<br><br>(Los Angeles County Super. Ct. No. 20STCV03198) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael L. Stern, Judge.  Affirmed.

Law Offices of Michael Leight, Michael Leight and John Gloger for Defendant and Appellant.

Liner Freedman Taitelman & Cooley, Michael A. Taitelman and Benjamin A. Marsh; Jones Ackerman & Corman and Michael S. Ackerman; Greines Martin Stein & Richland, Robin Meadow and Laura G. Lim for Plaintiff and Respondent.

* * * * * *

The 42-year ground lease for a shopping center allowed the tenant to elect to extend the lease for a second, 42-year term and contemplated that the base rent would be adjusted for that term—*if* either party invoked the lease's procedure for appraising the property's value for purposes of calculating the adjusted base rent. When neither party timely invoked that procedure, the tenant sued for declaratory relief that the landlord was stuck with the unadjusted base rent amount. Following trial before a judicial referee, the tenant prevailed. Because the plain meaning of the lease dictates that result, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

### I. Facts

#### A. *The lease*

##### 1. *The property*

Farmers and Merchants Trust Company of Long Beach (Farmers) serves as the trustee for four members of the Walker family and owns hundreds of parcels of property. One of those parcels is "Palomar Plaza," a large shopping center in San Marcos, California. Because Farmers' president, Daniel Walker, has a longstanding and personal interest in that specific parcel, it

2

is managed differently than Farmers' other parcels insofar as Walker manages it himself.

### 2. *Base term and rental obligations*

In the 1970s, the property was unimproved. On October 14, 1976, Farmers entered into a ground lease with Sycamore Properties (Sycamore) for commercial development of the land.[1] The "base term" of the lease is 42 years.[2] The rent due has two components: (1) "base rent[]" in the amount of $2,600 per month for the first 21 years, and $2,850 per month[3] for the 21-year remainder of the base term; and (2) "[a]dditional [r]ent[]" calculated as a percentage of what the tenant receives from subtenants over and above a "fixed minimum rent[]" amount not quantified in the lease but subsequently agreed by the parties to be $393,311, which corresponds to the rent collected by Sycamore from its subtenants between May 1979 and May 1980.

### 3. *Optional extension of term and rental obligations*

The tenant has the option to extend the base term of the lease for an additional 42 years as well as two "successive options" to extend the term for additional 10-year periods, but not

---

[1] The lease was amended two times on the same day in 1977, but those amendments are not pertinent to this appeal.

[2] While the lease states that the base term commences upon the removal of contingencies during an "interim term," the parties have consistently operated as if the base term commenced on the date of the lease (that is, October 14, 1976). We accept this mutual assumption as an undisputed fact.

[3] While the lease sets this amount at $3,000 per month, the parties have consistently operated as if the amount were $2,850. We accordingly adopt their practice.

to exceed a maximum 99-year term.  As pertinent here, the lease specifically states:

> "Tenant shall have the right . . . to extend the base term . . . for a new base term of forty-two (42) years from and after a date specified by Tenant with an adjustment in the monthly base rent[] pursuant to Section 2, Article VII below.  The date of such election by Tenant shall be considered a reappraisal adjustment date for purposes of Section 2, Article VII below."

The lease goes on to state that, "in the event" the tenant "exercise[s]" the option to extend the term for another 42 years, the "monthly base rent[]" "shall be adjusted" to an amount equal to one-twelfth of eight percent of the "then fair market value" of the land itself (that is, if the land were unimproved).  The lease goes on to specify the process by which the property is to be assessed to determine that fair market value.  Specifically, the lease states that, "[i]n the event either party hereto desires to establish said fair market value of the [property] for the purpose of determining the monthly base rent[] to be paid by Tenant," then (1) the "party desiring to establish the fair market value" "shall," "[o]n or before twelve (12) months prior to each [reappraisal[4]] adjustment date" (which, as noted above, is the

_____

**4** Although the lease refers here to a "*rental* adjustment date," this appears to be a typographical error because the full phrase states "*rental* adjustment date as provided hereinabove" and the lease defines only a "*reappraisal* adjustment date" and nowhere else refers to a "*rental* adjustment date."  (See *Gillotti v. Stewart* (2017) 11 Cal.App.5th 875, 903 [noting that "obvious typographical error[s] d[o] not render" a statutory offer to compromise "ambiguous"].)

4

date specified by the tenant when the tenant exercises the option to extend the lease), "attempt to mutually agree with the other party" as to the value; and (2) if no agreement is reached within 60 days of commencing negotiations, "either party may demand in writing" to have the value determined by a panel of professional appraisers.[5]  The lease also provides that the base rent adjusted for the extended term shall not be less than $2,500 per month.

In the event the appraisal process is not finalized by the tenant's specified reappraisal adjustment date, the tenant must continue paying Farmers the current base rent amount.  If the "new monthly base rent[]" is higher than the current amount, the tenant owes Farmers any underpayment; if it is lower, then Farmers "shall reimburse" the tenant any overpayment.

The lease does not address any adjustment to the calculation of "[a]dditional [r]ent[]" during the extended term.

### B.    *Purchase of the lease*

In March 2007, Sycamore sold its interest in the lease to VMA Palomar, LLC (VMA).  The Walker family was "disappointed" that Sycamore sold its interest to VMA rather than to Farmers, which had also made a bid.

Sycamore informed VMA at that time that the amount of base rent "was supposed to reset . . . at th[e] 42-year window."

---

[5]      The lease further defines the appraisal process as follows: Farmers and the tenant each select an appraiser, and those two appraisers appoint a third.  Of the three appraisals provided, the outlier value is discarded and the final value is calculated as the average of the remaining two appraisals.

### C.   *Prior litigation between the parties*[6]

In February 2008, and as pertinent here, VMA sued Farmers for declaratory relief to determine how "[a]dditional [r]ent[]" was to be calculated during any extended term under the lease.  In that litigation, VMA took the position that "[a]dditional [r]ent[]" during the extended term should be readjusted to use a fixed amount keyed to the rent received from subtenants in the immediately prior year (rather than the fixed $393,311 amount Farmers and Sycamore had been using).  To support this position, VMA argued that failing to readjust the fixed amount for "[a]dditional [r]ent[]" would result in unfair "double counting" because (1) calculating "[a]dditional [r]ent[]" by comparing subtenant rents to the fixed $393,311 amount would necessarily reflect inflationary increases in property values (because the fixed amount uses subtenant rents from 1979-1980), and (2) the readjusted base rent during the extended term already reflects inflationary increases in property values.  In making this argument, VMA repeatedly asserted that the base rent would be adjusted upon extension of the lease.

The trial court adopted VMA's position, ruling that the lease is ambiguous as to how to adjust the "[a]dditional [r]ent[]" during an extended term.  The trial court ordered that the lease be amended to include language specifying that the fixed amount from which "[a]dditional [r]ent[]" is measured would be adjusted upon an extended term.

---

6      The parties have submitted requests for judicial notice of various filings in the prior litigation.  Because these filings are already contained in the record on appeal, we deny those requests.

6

This Court reversed. In our ruling, we reasoned that the lease is wholly silent (rather than ambiguous) on whether "[a]dditional [r]ent[]" should be readjusted during an extended term, such that the trial court erred in "imply[ing]" new terms to the lease under the guise of interpreting an ambiguity. In light of this threshold determination, we had no occasion to reach the merits of VMA's double counting argument.

**D.    *Renewal of the lease***

On January 23, 2017, VMA sent Farmers notice that it was exercising its option to extend the term of the lease for another 42 years, and specified October 14, 2019 as the reappraisal adjustment date.

On April 16, 2018, pursuant to a request by VMA to facilitate a bank loan to be secured by VMA's interest in the lease, Farmers issued an estoppel certificate stating that (1) VMA "is not in default," (2) the lease "will expire" on October 13, 2061 (based on the option to extend exercised by VMA), (3) VMA "has paid in full all rent," and (4) the base rent "is subject to adjustment as of October 14, 2019 pursuant to Article VII, Section 2 of the [lease]."

Over the next 18 months, the parties had no communication regarding the extended lease. Much to VMA's "surprise[]," Farmers did not initiate the lease's appraisal process for adjusting the base rent prior to October 14, 2018, which is 12 months prior to the October 14, 2019 readjustment appraisal date VMA specified when it extended the lease. Although Farmers had software that tracked relevant due dates for the leases it manages, Farmers' president made himself personally responsible for monitoring this lease and did so by keeping track of the dates "in [his] head."

7

It was not until October 10, 2019 that Farmers sent VMA a letter stating its "desire[] to establish the fair market value" of the property and setting out its own unilaterally selected proposal for determining that value. Farmers also sent an appraisal report setting the fair market value of the property at $10 million, which, if adopted, would have raised the base rent by nearly $64,000 per month during the extended term.

VMA responded that Farmers' request to appraise the property to set an adjusted base rent was untimely because the lease "conditioned the right to initiate a reappraisal before a designated deadline" (of October 14, 2018), and that Farmers had missed that deadline.

VMA continued to pay the $2,580 monthly base rent, and Farmers continued to accept those payments until January 2021, when it began returning VMA's checks. VMA continues to pay the annual property taxes.

## II. Procedural Background

### A. *Complaint and cross-complaint*

In January 2020, VMA sued Farmers for declaratory relief and breach of contract, alleging that timely initiation of the appraisal process is a "condition[] precedent to any re-setting of the [b]ase [r]ent" and that Farmers failed to satisfy that condition precedent.[7]

Farmers filed a cross-complaint asserting causes of action for recission based on lack of consideration and mistake as well as for breach of contract, and alleging that *VMA's* failure to

---

[7] The complaint also named two assignees of the rent paid under the lease, but they are not at issue in this appeal because one assignee agreed to be bound by the judgment and the other was dismissed.

8

initiate the appraisal process "invalid[ated]" its exercise of the option to extend the lease.

**B.    *Trial***

The parties stipulated to submit the case to a judicial referee for trial.  Following a two-day trial in September 2023, the referee issued a final statement of decision in February 2024 finding in favor of VMA.[8]  The referee ruled that compliance with the appraisal process to determine the fair market value of the property "was a condition precedent to the right of 'either party' to adjust the [b]ase [r]ent" and there was "no dispute that neither [Farmers] nor VMA [timely] initiated th[at] process."  Because Farmers "was the party 'desiring to establish the fair market value'" but "failed to comply with the deadline to initiate the valuation process," Farmers "failed to establish that it had a right to adjust the [b]ase [r]ent."  The referee further found that the parties' prior litigation did not preclude VMA—under the doctrines of judicial estoppel, issue preclusion, or judicial admission—from arguing that an adjustment to the base rent upon extension of the lease was contingent upon one of the parties initiating the lease's appraisal process.

**C.    *Judgment and appeal***

Following the trial court's entry of judgment for VMA based on the referee's statement of decision,[9] Farmers timely filed this appeal.

---

[8]    The parties engaged in an inordinate amount of litigation over the referee's tentative statement of decision that we need not summarize here.

[9]    Again, the parties engaged in extensive litigation over the entry of judgment, which we need not summarize here.

## DISCUSSION

Farmers argues that the referee erred in ruling that the base rent did not automatically adjust upon extension of the lease and that adjustment was instead contingent upon one of the parties invoking the lease's appraisal process in a timely fashion. Because neither party invoked the lease's appraisal process by opening negotiations by October 2018 or demanding an appraisal by December 2018 (that is, 60 days later),[10] Farmers focuses chiefly on the arguments that (1) the referee's interpretation of the lease is wrong; (2) even if correct, VMA's conduct in the prior litigation entitles Farmers to judgment; and (3) waiver and other doctrines mandate judgment in Farmers' favor.

In reviewing a judgment based on a judicial referee's statement of decision, we treat the action as if it were tried by the

---

**10** Farmers disputes this point, asserting that it timely initiated the appraisal process by stating—in its April 2018 estoppel certificate—that "the base rent is subject to adjustment." But the language in the estoppel certificate merely parroted the lease's language. Quoting the lease in a document submitted to a bank neither initiated the negotiation process with VMA nor demanded appraisal. Although Farmers' president and its attorney expressed their "belief" and "feelings" that the estoppel certificate sufficed, those sentiments do not alter what Farmers actually did or whether it complied with the lease's requirements because those requirements are defined objectively, not subjectively. (*Tribeca Companies, LLC v. First American Title Ins. Co.* (2015) 239 Cal.App.4th 1088, 1111 (*Tribeca*) ["'[t]he terms of a contract are determined by objective rather than subjective criteria'"]; *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 956 (*Founding Members*) ["[t]he parties' undisclosed intent or understanding is irrelevant to contract interpretation"].)

trial court. (*Barickman v. Mercury Casualty Co.* (2016) 2 Cal.App.5th 508, 516; Code Civ. Proc., § 644.)

## I. Interpretation of the Lease

Farmers contends that the referee erred in reading the lease to make a base rent adjustment for the extended term contingent upon Farmers or VMA invoking the lease's appraisal process, asserting instead that adjustment happens automatically upon extension or that VMA (as the party seeking extension of the lease) must invoke the process. We review the referee's interpretation of the lease—like any other contract—de novo.[11] (*BMC Promise Way, LLC v. County of San Benito* (2021) 72 Cal.App.5th 279, 284 [in declaratory relief action, interpretation of instrument reviewed de novo]; *Eucasia Schools Worldwide, Inc. v. DW August Co.* (2013) 218 Cal.App.4th 176, 181 (*Eucasia*) [lease agreement subject to general rules governing interpretation of contracts].)

---

[11] Because, as discussed below, our interpretation of the lease turns on the lease's plain language and not extrinsic evidence entailing factual disputes, and because our de novo review means we are not bound by the referee's reasoning, Farmers' attacks on the adequacy of the reasoning set forth in the referee's statement of decision are of no consequence. The statement of decision is adequate in any event because it disposes of the basic issues and fairly discloses the referee's determination of the ultimate facts and material issues (*Duarte Nursery, Inc. v. California Grape Rootstock Improvement Com.* (2015) 239 Cal.App.4th 1000, 1012); contrary to what Farmers suggests, the referee was not obligated to "respond point by point" to the dozens of issues posed by Farmers (*Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1314, fn. 12).

**A.** *Analysis*

In interpreting a contract, our task is to give effect to the parties' mutual intent, which is ascertained "solely from the language of the [contract]" where that language is clear and explicit. (*Eucasia, supra*, 218 Cal.App.4th at p. 181; *Glovis America, Inc. v. County of Ventura* (2018) 28 Cal.App.5th 62, 68-69; *Hartford Casualty Ins. Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277, 288; *Santisas v. Goodin* (1998) 17 Cal.4th 599, 608; *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 (*Waller*); Civ. Code, §§ 1636, 1638, 1639.) Unless the parties clearly intended to give the terms in a lease technical or special meanings, we use their ordinary and popular meaning. (*Hartford Casualty*, at p. 288; *Santisas*, at p. 608; *Waller*, at p. 18; Civ. Code, § 1644.) And we construe the lease as a whole, giving effect to every part and not rendering any part surplusage. (*Glovis America*, at p. 69; *Berg v. MTC Electronics Technologies Co.* (1998) 61 Cal.App.4th 349, 361; *Waller*, at p. 18; Civ. Code, § 1641.)

With these principles in mind, we independently conclude that the lease does not provide for any adjustment of the base rent unless one of the parties timely invokes the lease's appraisal process. To be sure (and as Farmers points out), section 1 of Article III of the lease grants the tenant "the right . . . to extend the base term . . . *with an adjustment in the monthly base rent[] pursuant to Section 2, Article VII below*" (italics added), and the first paragraph of section 2 of Article VII provides that "[u]pon the commencement of the first option to extend the term of the lease, . . . the monthly base rent[] *shall be adjusted*" (italics added). But these seemingly unqualified phrases are qualified by the second paragraph of section 2 of Article VII, which creates a

12

process for "establish[ing] [the] fair market value . . . for the purpose of determining the [adjusted] monthly base rent[]" and, critically, explicitly specifies that this process—and necessarily the adjusted base rent it establishes—is triggered only "[i]n the event *either party*" to the lease "desires to establish" that new fair market value and invokes that process. (Italics added.) By making the right to adjustment of the base rent contingent upon invoking the appraisal process, the lease creates a condition precedent to the adjustment of the base rent upon extension of the lease. (Civ. Code, § 1436 ["A condition precedent is one which is to be performed before some right dependent thereon accrues . . ."]; *Barroso v. Ocwen Loan Servicing, LLC* (2012) 208 Cal.App.4th 1001, 1009 [whether language constitutes a condition precedent turns on "'the words they have employed in the contract'"].) "Where . . . the parties have agreed that a demand for arbitration must be made within a certain time, that demand is a condition precedent that must be performed before the contractual duty to submit the dispute to arbitration arises" (*Platt Pacific, Inc. v. Andelson* (1993) 6 Cal.4th 307, 313-314 (*Platt Pacific*)); the same logic applies to a demand for appraisal that must be made within a certain time. What is more, given that the lease also sets a minimum adjusted base rent for an extended term that is *lower* than the original base rent (and also provides for a refund of any overpayment by the tenant of that potentially lower amount), the lease contemplates that the adjusted base rent might be higher *or lower* than the base rent during the first 42 years, thus explaining why the lease leaves it to each party whether to *elect* to invoke the appraisal process for the base rent upon extension.

**B.** *Farmers' counter-arguments*

Farmers resists our interpretation with a plethora of arguments that we group into four categories.

First, Farmers asserts that the plain language of the lease does *not* make adjustment of the base rent contingent upon invocation of the appraisal process. More specifically, Farmers points to the seemingly unqualified language in section 1 of Article III and the first paragraph of section 2 of Article VII, which as explained above respectively indicates that the tenant has a right to "extend the base term . . . *with an adjustment in monthly base rent[]*" and that "the monthly base rent[] *shall be adjusted*" "[u]pon the commencement of the first option to extend." (Italics added.) Farmers also points to the last paragraph in section 2 of Article VII, which contemplates that the appraisal process may not be completed by the reappraisal adjustment date and obligates the tenant to make up any underpayment of the adjusted base rent if the appraisal process is not finished by that date. These provisions, Farmers maintains, indicate that an adjustment in the base rent happens automatically and that the appraisal process has no fixed deadlines (or else there would be no need to account for recoupment of underpaid adjusted base rent). We reject Farmers' reading of the lease because it wholly ignores—and thus impermissibly gives no effect to and renders superfluous—the lease's provisions requiring "either party" to initiate the appraisal process that necessarily undergirds any adjustment in the rent. Further, the fact that the lease sets no fixed deadline by which the appraisal process must *end* does not negate the lease's plain language setting a date by which the process must *begin*. At oral argument, Farmers asserted that the appraisal process set forth

14

in the lease is optional and that the parties are free to sidestep that process entirely by simply agreeing to a new, readjusted base rent for the extended term. But the lease's plain language describes the appraisal process as mandatory, and that mandatory process includes a mechanism by which the parties are first to negotiate and possibly agree upon a newly adjusted base rent. Farmers seems to suggest that our interpretation of the lease requires a rewriting of the lease to make the duty of either party to invoke the appraisal process even clearer, but the lease *as written* is clear enough.

Second, Farmers urges that maxims of contractual interpretation and jurisprudence favor its reading of the lease. It asserts that the lease is commercially unreasonable insofar as it saddles the landlord with a 42-year lease extension without any increase in the base rent. But the commercial unreasonableness of a contract's outcome provides no basis to re-write a contract (*Thrifty Payless, Inc. v. Mariners Miles Gateway, LLC* (2010) 185 Cal.App.4th 1050, 1063; *Ellison v. City of San Buenaventura* (1975) 48 Cal.App.3d 952, 962), and even if it did, the lease *did* provide a mechanism to adjust the base rent—Farmers just failed to invoke it. Relying on the maxim that "[a] person who takes the benefit must bear the burden" (Civ. Code, § 3521), Farmers asserts that we must read the lease to place the burden of initiating the appraisal process on VMA because VMA must accept that burden in order to obtain the benefit of a lease extension. But VMA *is* already bearing a burden as a condition of the extension—namely, the burden of paying all the rent due during the extended period.

Third, Farmers argues that "an argument could be made that the [l]ease is ambiguous" as to whether and by whom the

15

appraisal process must be invoked, and that this ambiguity must be construed in its favor under Civil Code section 1649 and in light of VMA's conduct in the prior litigation over the "[a]dditional [r]ent[]" provision of the lease.

As a threshold matter, we conclude that the lease is susceptible to only one reasonable interpretation and, as such, it is not ambiguous. (*Carolina Beverage Corp. v. FIJI Water Co., LLC* (2024) 102 Cal.App.5th 977, 989 [whether contract is ambiguous is a threshold legal question]; *Waller*, *supra*, 11 Cal.4th at p. 18 [contract is "ambiguous [only] when it is capable of two or more constructions, both of which are reasonable"].) Nor "will [we] strain to create an ambiguity where none exists." (*Waller*, at pp. 18-19.)

Even if the lease were ambiguous, neither of Farmers' arguments for construing that ambiguity in its favor is persuasive.

Civil Code section 1649 provides that "[i]f the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, *at the time of making it*, that the promisee understood it." (Italics added.) Relying on this provision, Farmers proffers what *it* believed VMA understood at the time of the prior litigation (in 2008) and at the time VMA acquired the lease (in 2007). But none of these proffers relates to "the time of making" the lease back in 1976, which is the only time that matters under Civil Code section 1649. (See *Kashmiri v. Regents of University of California* (2007) 156 Cal.App.4th 809, 831; *Kim v. TWA Construction, Inc.* (2022) 78 Cal.App.5th 808, 832; see also Civ. Code, § 1636 [contract must be interpreted to give effect to the mutual intent of the parties "as it existed at the time of

16

contracting"].) Farmers responds that it is nevertheless appropriate to evaluate VMA's understanding at the time it acquired the lease from Sycamore in 2007 because "VMA's rights under the [l]ease can be no greater than the rights of" its predecessor, Sycamore, but there is no evidence that Sycamore's indication *to VMA* that it anticipated the base rent would go up during an extended term was ever communicated *to Farmers* (and thus could form a basis for *Farmers'* belief in that regard).[12]

Although a contracting party's conduct after execution of a contract and before a controversy has arisen can be relevant to construing an ambiguity in a contract (*Kennecott Corp. v. Union Oil Co.* (1987) 196 Cal.App.3d 1179, 1189-1190; *Tribeca, supra,* 239 Cal.App.4th at p. 1111), VMA's assertions in the prior litigation regarding the inevitability of an adjustment of the base rent at the time of extension (as well as its decision in 2017 to estimate the fair market value of the property when unimproved) do not reflect a belief that the lease makes adjustment *contractually* automatic so much as it reflects VMA's reasonable belief that adjustment would be *practically* automatic because Farmers would most likely invoke the appraisal process provided for in the lease (rather than "negligent[ly]" overlooking that condition precedent to an adjustment).

Fourth, Farmers cites the testimony of its president and attorney relaying *their* subjective beliefs that the lease makes adjustment of the base rent automatic or otherwise obligates

---

12 At oral argument, Farmers also argued that it is appropriate to examine the parties' understanding at the time Farmers issued the estoppel certificate in 2018, but this argument ignores Civil Code section 1649's focus on the parties' understanding at the time the underlying lease was "ma[de]."

17

VMA to invoke the appraisal process. But at least one Farmers employee believed that *Farmers* had a duty to invoke the appraisal process, and more to the point, contract interpretation turns on the parties' *objective* manifestations of intent rather than their uncommunicated subjective beliefs. (*Founding Members, supra*, 109 Cal.App.4th at p. 956.) Farmers' assertion that California's longstanding and well-established objective theory of contracts is confined to the "insurance policy context" is frivolous. And to the extent the attorney's testimony was meant to function as expert testimony as to the definitive meaning of the contract (rather than whether the contract is subject to a different interpretation), it is inadmissible for that purpose. (E.g., *Tustin Field Gas & Food, Inc. v. Mid-Century Ins. Co.* (2017) 13 Cal.App.5th 220, 231; see *In re Tobacco Cases I* (2010) 186 Cal.App.4th 42, 51 ["the interpretation of contractual language is a legal matter for the court . . . and '[e]xpert opinion on contract interpretation is usually inadmissible'"]; cf. *Pacific Gas & Electric Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37-38.)

## II. Binding Effect of VMA's Prior Litigation Positions

Farmers alternatively asserts that, even if the terms of the lease support the referee's ruling, VMA took the position in the prior litigation that adjustment of the base rent was automatic and that position binds VMA here and *trumps* the plain language of the lease under the doctrines of judicial estoppel, issue preclusion, and judicial admissions. Because the pertinent facts are undisputed, we review de novo the applicability of judicial estoppel and issue preclusion (*Vaghashia v. Vaghashia* (2024) 106 Cal.App.5th 188, 195 [judicial estoppel]; *Cheveldave v. Tri Palms Unified Owners Assn.* (2018) 27 Cal.App.5th 1202, 1218-

18

1219 [issue preclusion]); we review for an abuse of discretion the referee's conclusion that VMA did not make a judicial admission (*Kurinij v. Hanna & Morton* (1997) 55 Cal.App.4th 853, 871).

### A. *Judicial estoppel*

"The doctrine of judicial estoppel may be invoked only when "'(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake.'"'" (*Lonky v. Patel* (2020) 51 Cal.App.5th 831, 847, citing *Aguilar v. Lerner* (2004) 32 Cal.4th. 974, 986-987; *MW Erectors, Inc. v. Niederhauser Ornamental & Metal Works Co., Inc.* (2005) 36 Cal.4th 412, 422 (*MW Erectors*).) The doctrine can preclude a party from relying upon a legal theory inconsistent with a theory the party previously asserted (*Nist v. Hall* (2018) 24 Cal.App.5th 40, 48), including a legal theory regarding enforceability of a contract (*Blix Street Records, Inc. v. Cassidy* (2010) 191 Cal.App.4th 39, 50).

Judicial estoppel does not apply here. Even if we accept that VMA made arguments in the prior litigation premised on the assumption that adjustment of the base rent was automatic upon extension of the lease, VMA did not succeed in asserting that position because VMA *lost* the prior litigation. While the appellate court's opinion in that prior litigation summarized the lease's terms and stated that "Article VII, Section 2 of the Ground Lease *provides for modification* of the monthly Base Rental if the tenant exercises its option to extend the lease term" (italics added), the meaning of that provision was not at issue

19

and the phrase "provides for modification" means merely that the base rent may be modified, not that it is inevitably and automatically modified.  Farmers responds that success is not always required, and cites *Thomas v. Gordon* (2000) 85 Cal.App.4th 113.  *Thomas* held that judicial estoppel could be applied against a party who asserted a contrary position during a bankruptcy proceeding in which it did not prevail, but *Thomas* did so based on the "singular nature of bankruptcy law"—namely, that a party filing for bankruptcy effectively "succeeds" by virtue of obtaining a stay of all other litigation during the bankruptcy and regardless of the ultimate outcome of the bankruptcy.  (*Id.* at pp. 119-120.)  This case is different.  And even if VMA had limited success before *the trial court* in the prior litigation (before we reversed that court), judicial estoppel is an equitable doctrine and the referee did not abuse his discretion in declining to apply it.  (*MW Erectors*, *supra*, 36 Cal.4th at p. 422.)

## B.    *Issue preclusion*

The doctrine of issue preclusion applies to "prevent[] 'relitigation of previously decided issues'" between the same parties, but it applies only if the "'identical issue'" was "'actually litigated and necessarily decided'" in the prior litigation and that litigation has been "'final[ly] adjudicat[ed].'"  (*Samara v. Matar* (2018) 5 Cal.5th 322, 327, quoting *DKN Holdings LLC v. Faerber* (2015) 61 Cal.4th 813, 825 (*DKN Holdings*); *Pacific Lumber Co. v. State Water Resources Control Bd.* (2006) 37 Cal.4th 921, 943.)  Issue preclusion does not reach issues that were neither expressly nor impliedly submitted for decision in a prior action.  (*Ayala v. Dawson* (2017) 13 Cal.App.5th 1319, 1327; *Rodriguez v. Lawrence Equipment, Inc.* (2024) 106 Cal.App.5th 645, 660.)

20

Issue preclusion does not apply here. That is because the issue of whether either party's initiation of the appraisal process constitutes a condition precedent to the adjustment of base rent during an extended term of the lease was not decided in the prior litigation between Farmers and VMA. Rather, we resolved the parties' controversy over the "[a]dditional [r]ent[]" provisions of the lease based on our precursor determination that the lease was silent (rather than ambiguous) as to adjustment of "[a]dditional [r]ent[]." Farmers responds that the doctrine of issue preclusion also reaches issues that could have been adjudicated, but relies on inapplicable precedent regarding the separate doctrine of claim preclusion. (*Stark v. Coker* (1942) 20 Cal.2d 839, 842-843.) We decline Farmers' invitation to ignore the critical distinctions between the two doctrines. (*DKN Holdings*, *supra*, 61 Cal.4th at p. 824 [the two doctrines "have different requirements"].)

### C. *Judicial admission*

"'Judicial admissions are admissions of fact that "may be made in a pleading, by stipulation during trial, or by response to request[s] for admission."' [Citation.] '[I]f a factual allegation is treated as a judicial admission, then neither party may attempt to contradict it—the admitted fact is effectively conceded *by both sides*.' [Citation.] However, judicial admissions pertain to factual allegations—they do not involve legal theories, legal conclusions, legal arguments, or assertions concerning mixed questions of law and fact." (*Williams v. Doctors Medical Center of Modesto, Inc.* (2024) 100 Cal.App.5th 1117, 1140; *Eisen v. Tavangarian* (2019) 36 Cal.App.5th 626, 637.)

VMA's declaratory relief complaint in the prior litigation alleging that the "[a]dditional [r]ent[]" should also be adjusted

because base rent is adjusted during an extended term does not constitute a binding judicial admission for two reasons. First, a pleading in a prior proceeding may be offered against the pleader only as an evidentiary admission, not as a judicial admission; as an evidentiary admission, it may be rebutted with other evidence. (*Mt. Hawley Ins. Co. v. Lopez* (2013) 215 Cal.App.4th 1385, 1425, fn. 21.) Second, VMA's allegation regarding the meaning of the lease is a legal—not a factual—allegation. (*Stroud v. Tunz* (2008) 160 Cal.App.4th 377, 384 ["Legal conclusions and assertions involving a mixed question of law and fact are not the stuff of judicial admissions"]; cf. *Aljabban v. Fontana Indoor Swap Meet, Inc.* (2020) 54 Cal.App.5th 482, 497 [allegation of landlord-tenant relationship is a "factual allegation" subject to construction as a judicial admission].)

## III. Miscellaneous Arguments

Farmers makes three further arguments.

First, Farmers argues that VMA cannot prevail because it never proved, by clear and convincing evidence, that Farmers "waived" its right to adjust the base rent; at most, Farmers continues, VMA established that Farmers' president made a negligent mistake in not invoking the appraisal process. This argument misunderstands our ruling.[13] We are not concluding that Farmers waived its contractual right to adjust the base rent; we have concluded that Farmers' right to do so never came into

---

[13]     It also misunderstands the referee's ruling. Notwithstanding the referee's reference in the conclusion of its statement of decision to Farmers' "waiv[er of its] right to an appraisal," the referee's *analysis*—like ours—turned on Farmers' failure to establish a *right* to adjustment in the first place due to its failure to satisfy the lease's condition precedent.

being because Farmers did not satisfy the condition precedent to its existence—and the failure to satisfy a condition precedent need not be intentional. (See *Platt Pacific*, *supra*, 6 Cal.4th at p. 314 ["when a party has failed to fulfill a condition that was within its power to perform, it is not an excuse that the party did not thereby intend to surrender any rights under the agreement"].) Farmers' further assertion that VMA failed to prove equitable estoppel fails for the same reason.

Second, Farmers argues that VMA never proved its allegations that Farmers' conduct in accepting VMA's payment of unadjusted base rent after the dispute in this case arose constituted a waiver or estoppel of Farmers' position that an adjustment of the base rent is required. VMA's waiver and estoppel arguments only become relevant if Farmers prevails under the terms of the lease—and we have concluded Farmers does not.

Lastly, Farmers argues that the covenant of good faith and fair dealing implicit in every contract obligates us to construe the lease to require *VMA* to invoke the appraisal process. We decline Farmers' invitation to use the covenant to rewrite the parties' agreement simply because the lease provisions operated harshly against Farmers due to its failure to protect its own interests. (See *Vicko Ins. Services, Inc. v. Ohio Indemnity Co.* (1999) 70 Cal.App.4th 55, 70.)

## DISPOSITION

The judgment is affirmed. VMA is entitled to its costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.

_____, P.J.
HOFFSTADT

We concur:


_____, J.
BAKER


_____, J.
KIM (D.)